STATE OF MAINE                                          SUPERIOR COURT
                                                           CIVIL ACTION
YORK, ss.                                          DOCKET NO. AP-02-068

LESLEY LEIGHTON,

            Plaintiff

      v.                              **ORDER**

TOWN OF WATERBORO,

            Defendant


      This case comes before the Court on briefs and stipulated facts in Petitioner

Lesley Leighton's 80B appeal of a decision by the Town of Waterboro Zoning Board of

Appeals denying him a Growth Control permit, along with an independent Declaratory

Judgment claim.

                                    **FACTS**

      Petitioner Lesley Leighton (Leighton) owns property on Route 5 in Waterboro,

Maine. In December 1992, Respondent Town of Waterboro (Waterboro) approved

Leighton's subdivision plan for Victoria Park, a mobile home park for 23 mobile homes.

Over the next ten years, Leighton spent time and money installing infrastructure for the

park, including wells, septic systems, electrical and plumbing connections, landscaping,

roads, tie downs, and 23 concrete pads to support the mobile homes. By July 23, 2002,

Leighton had acquired building permits and installed mobile homes on 10 of 23

available spots. Leighton acquired six additional building permits on July 23, 2002,

three that were used to install additional mobile homes, and three to be used in 2003.

      On July 24, 2002, Waterboro adopted a Growth Management Ordinance,

requiring Leighton to apply for a Growth Permit before obtaining building permits for

additional mobile homes. The effective date of the ordinance was July 1, 2002. When Leighton applied for a Growth Permit for additional mobile homes on July 30, 2002, the Waterboro Code Enforcement Officer (CEO) denied his request under the Growth Management Ordinance. Leighton appealed to the Waterboro Zoning Board of Appeals (ZBA), which upheld the CEO's denial. On October 25, 2002, Leighton filed this appeal pursuant to Maine Civil Rule 80B, asking this Court to reverse the decision of the ZBA and allow him to add mobile homes (Count I). Leighton also asserts an independent claim, asking this Court for declaratory relief finding the provisions of Waterboro's Growth Management Ordinance unconstitutional. (Count II).

## DISCUSSION

In an 80B appeal, the Superior Court, reviews the operative decision of the municipality for abuse of discretion, errors of law, or findings unsupported by substantial evidence in the record. *Yates v. Town of Southwest Harbor*, 2001 ME 2, ¶ 10, 763 A.2d 1168, 1171; M.R. Civ. P. 80B(f). This Court will affirm that decision unless it is arbitrary, capricious, or unreasonable. *Senders v. Town of Columbia Falls*, 647 A.2d 93, 94 (Me. 1994). This Court will reverse the decision only if the evidence compels a different conclusion. *Perrin v. Town of Kittery*, 591 A.2d 861, 863 (Me. 1991). Interpretation of a local zoning ordinance is a question of law which this Court reviews de novo. *Isis Dev., LLC v. Town of Wells*, 2003 ME 149, ¶ 3 n.4, 836 A.2d 1285, 1286-87. In construing an ordinance, the court will "look both to the ordinance as a whole and to its first enumerated purposes." *Id.* at ¶ 4. The burden is on the petitioner to show, based on evidence in the record, that the ZBA was in error. *Britton v. Town of York*, 673 A.2d 1322, 1325 (Me. 1996).

a. Vested Rights.

2

Leighton argues his mobile home building permits are exempt from the requirements of Waterboro's Growth Management Ordinance, because the ordinance cannot be retroactively applied to divest him of his vested right to install all 23 mobile homes. Waterboro argues that the Growth Management Ordinance expressly applies to Leighton as a subdivision owner, and to any mobile homes built on the ten remaining sites, and survives the test for a deprivation of vested rights.

Municipalities are permitted to retroactively apply their ordinances. *Portland v. Fisherman's Wharf Assoc.*, 541 A.2d 160, 164 (Me. 1988). Such retroactive application may "determine the legal significance of acts or events that occurred prior to its effective dates." *Kittery Retail Ventures v. Town of Kittery*, 2004 ME 65, ¶ 11, 856 A.2d 1183, 1189. Such retroactive application may not be allowed where it would deprive plaintiffs of "vested rights" they had acquired in their property. *Portland v. Fisherman's Wharf Assoc.*, 541 A.2d at 164 (finding no vested rights were acquired simply because the plaintiff acquired a building permit or spent money complying with regulations before the effective date). Before proposed construction can go forward despite an existing ordinance on the theory of "vested rights", the owner must meet three requirements: "1) there must be the actual physical commencement of some significant and visible construction; 2) the commencement must be undertaken in good faith ... with the intention to continue with the construction and carry it through to completion; and 3) the commencement of construction must be pursuant to a validly issued building permit." *Sahl v. Town of York*, 2000 ME 180, ¶ 12, 760 A.2d 266, 269.

Here, the Growth Management Ordinance became effective July 1, 2002, before Leighton had an opportunity to put mobile homes on ten of the remaining sites allowed in the subdivision approval for Victoria Park. On July 23, 2002, Leighton had acquired approval for three building permits for mobile homes to be installed in 2003 but these

3

were not issued because Leighton failed to obtain Growth Permits. He had no building permits for putting mobile homes on the seven other empty sites.

Waterboro's Growth Management Ordinance applies to "all new dwelling units (including manufactured housing) within the Town of Waterboro." Mobile homes are expressly included in the definition of "manufactured housing" and "dwelling unit." Ord. at § 16 (B). Both Growth Permits and Building Permits are required before construction of a new "dwelling unit" is allowed.

Here Leighton's subdivision approval for installing mobile homes on the remaining ten sites in Victoria Park fails the third prong of the test for "vested rights." Construction had not begun on the vacant sites, and the three building permits for additional mobile homes in 2003 have not been "validly issued" by meeting Growth Management Ordinance requirement for Growth Permits. Nor, as Leighton argues, are the unbuilt mobile homes analogous to unbuilt apartment units, for which construction of one is a "commencement of construction" for all. Notwithstanding Waterboro's subdivision approval and Leighton's site preparation for the park as a whole, each mobile home in the park is a new "dwelling unit," under Waterboro ordinances, subject to individual permit requirements. Subdivision approval for the park as a whole is not a substitute for a valid building permit issued by a separate municipal authority under separate standards in a separate proceeding. *Larrivee v. Timmons*, 549 A.2d 744, 746 (Me. 1988)(separate approvals needed in the course of construction are not merely steps in a single proceeding). Leighton's investment of time and money in site preparation is also not the equivalent of "construction commenced under a valid permit." *Portland v. Fisherman's Wharf Assoc.*, 541 A.2d 160, 164 (Me. 1988). Because Leighton can claim "vested rights" in completing construction on the ten remaining sites in Victoria Park,

4

only if he began construction of those mobile homes pursuant to a validly issued building permit, his appeal on this basis must fail.

b. Validity of Waterboro's Growth Management Ordinance.

i. Compatibility with the Comprehensive Plan.

Leighton argues Waterboro's Growth Management Ordinance does not comply with a Maine statute requiring growth management ordinances to be consistent with a town's comprehensive plan. 30-A M.R.S.A. § 4314(3) (2004).[1] Leighton directs the Court

---

[1]     3. RATE OF GROWTH, ZONING AND IMPACT FEE ORDINANCES. After January 1, 2003, any portion of a municipality's or multimunicipal region's rate of growth, zoning or impact fee ordinance must be consistent with a comprehensive plan adopted in accordance with the procedures, goals and guidelines established in this subchapter. The portion of a rate of growth, zoning or impact fee ordinance that is not consistent with a comprehensive plan is no longer in effect unless:

    C.    The ordinance or portion of the ordinance is exempted under subsection 2;

    D.    The municipality or multimunicipal region is under contract with the office to prepare a comprehensive plan or implementation program, in which case the ordinance or portion of the ordinance remains valid for up to 4 years after receipt of the first installment of its first planning assistance grant or for up to 2 years after receipt of the first installment of its first implementation assistance grant, whichever is earlier;

(NOTICE: TEXT OF PARAGRAPH E AS AMENDED BY 2003, c. 595, § 1.)

    E.    The ordinance or portion of the ordinance conflicts with a newly adopted comprehensive plan or plan amendment adopted under this subchapter, in which case the ordinance or portion of the ordinance remains in effect for a period of up to 24 months immediately following adoption of the comprehensive plan or plan amendment;

(NOTICE: TEXT OF PARAGRAPH E AS AMENDED BY 2003, c. 641 § 4.)

    E.    The ordinance or portion of the ordinance conflicts with a newly adopted comprehensive plan or plan amendment adopted in accordance with the procedures, goals and guidelines established in this subchapter, in which case the ordinance or portion of the ordinance remains in effect for a period of up to 24 months immediately following adoption of the comprehensive plan or plan amendment; or

(NOTICE: TEXT OF PARAGRAPH F AS AMENDED BY 2003, c. 595, § 2.)

    F.    The municipality or multimunicipal region applied for and was denied financial assistance for its first planning assistance or implementation assistance grant under this subchapter due to lack of state funds on or before January 1, 2003. If the office subsequently offers the municipality or multimunicipal region its first planning assistance or implementation assistance grant, the municipality or multimunicipal region has up to one year to contract with the office to prepare a comprehensive plan or implementation program, in which case the municipality's or multimunicipal region's ordinances will be subject to paragraph D; or

to Waterboro's 1990 Comprehensive Plan, which includes a section devoted to affordable housing, including provisions that continue to allow manufactured housing (Appdx. 35, § II Affordable Housing Plan at p.6). Contrary to Leighton's assertions however, the 1990 Plan does not encourage (or discourage) trailer park development, but rather recognizes trailer parks as "an important component in the housing mix" while insisting such parks be restricted in the future to suitable sites, and that no more than one new park be allowed. (*Id.* at p. 7).

Elsewhere, Waterboro's 1990 Comprehensive Plan states as a goal: "To establish a well-balanced land use pattern that meets current and future needs of Waterboro in a manner that is economical, equitable, environmentally sound, and sensitive to the Town's visual and cultural character." Appnx. 35, § I Policy Development at p. 16). Part of that goal, Objective 11.2 is "To monitor future growth and development in a manner that preserves the fiscal capacity of the Town to provide essential services and facilities." Objective 11.8 further seeks "to conserve the rural character of the community."

Waterboro's Growth Management Ordinance likewise neither favors nor disfavors mobile homes, identifying them as one of many "dwelling units" for purposes

---

(NOTICE: TEXT OF PARAGRAPH F AS AMENDED BY 2003, c. 641, § F.)
    F.    The municipality or multimunicipal region applied for and was denied financial assistance for its first planning assistance or implementation assistance grant under this subchapter due to lack of state funds on or before January 1, 2003. If the office subsequently offers the municipality or multimunicipal region its first planning assistance or implementation assistance grant, the municipality or multimunicipal region has up to one year to contract with the office to prepare a comprehensive plan or implementation program, in which case the municipality's or multimunicipal region's ordinances will be subject to paragraph D.
    G.    The ordinance or portion of an ordinance is an adult entertainment establishment ordinance, as defined in section 4352, subsection 2, that has been adopted by a municipality that has not adopted a comprehensive plan.

6

of growth permits. As such, mobile homes are treated no differently from any other "dwelling units" that may supply housing to Waterboro residents. The Growth Management Ordinance limiting the number of building permits issued in a given year for all dwelling units in order to regulate the rate at which new dwelling units are added is in keeping with the 1990 Comprehensive Plan's goal of balancing current and future needs, and its objective of monitoring growth and conserving resources.

ii. Compliance with Maine growth management statutes.

Leighton also maintains implementation of Waterboro's Growth Management Ordinance did not comply with the provisions of 30-A M.R.S.A. § 4326, stipulating the necessary elements of a growth management program.[2] Leighton argues Waterboro

---

[2] § 4326. Growth management program elements

A growth management program must include at least a comprehensive plan, as described in subsections 1 to 4, and an implementation program as described in subsection 5.

1. INVENTORY AND ANALYSIS. A comprehensive plan must include an inventory and analysis section addressing state goals under this subchapter and issues of regional or local significance that the municipality or multimunicipal region considers important. The inventory must be based on information provided by the State, regional councils and other relevant local sources. The analysis must include 10-year projections of local and regional growth in population and residential, commercial and industrial activity; the projected need for public facilities; and the vulnerability of and potential impacts on natural resources.

The inventory and analysis section must include, but is not limited to:

A. Economic and demographic data describing the municipality or multimunicipal region and the region in which it is located;

B. Significant water resources such as lakes, aquifers, estuaries, rivers and coastal areas and, when applicable, their vulnerability to degradation;

C. Significant or critical natural resources, such as wetlands, wildlife and fisheries habitats, significant plant habitats, coastal islands, sand dunes, scenic areas, shorelands, heritage coastal areas as defined under Title 5, section 3316, and unique natural areas;

D. Marine-related resources and facilities such as ports, harbors, commercial moorings, commercial docking facilities and related parking, and shell fishing and worming areas;

E. Commercial forestry and agricultural land;

F. Existing recreation, park and open space areas and significant points of public access to shorelands within a municipality or multimunicipal region;

G. Existing transportation systems, including the capacity of existing and proposed major thoroughfares, secondary routes, pedestrian ways and parking facilities;

H. Residential housing stock, including affordable housing;

I. Historical and archeological resources including, at the discretion of the municipality or multimunicipal region, stone walls,

stone impoundments and timber bridges of historical significance;

J.    Land use information describing current and projected development patterns; and

K.    An assessment of capital facilities and public services necessary to support growth and development and to protect the environment and health, safety and welfare of the public and the costs of those facilities and services.

2.    POLICY DEVELOPMENT. A comprehensive plan must include a policy development section that relates the findings contained in the inventory and analysis section to the state goals. The policies must:

A.    Promote the state goals under this subchapter;

B.    Address any conflicts between state goals under this subchapter;

C.    Address any conflicts between regional and local issues; and

D.    Address the State's coastal policies if any part of the municipality or multimunicipal region is a coastal area.

3.    IMPLEMENTATION STRATEGY. A comprehensive plan must include an implementation strategy section that contains a timetable for the implementation program, including land use ordinances, ensuring that the goals established under this subchapter are met. These implementation strategies must be consistent with state law and must actively promote policies developed during the planning process. The timetable must identify significant ordinances to be included in the implementation program. The strategies and timetable must guide the subsequent adoption of policies, programs and land use ordinances.

3-A.    GUIDELINES FOR POLICY DEVELOPMENT AND IMPLEMENTATION STRATEGIES. In developing its strategies and subsequent policies, programs and land use ordinances, each municipality or multimunicipal region shall employ the following guidelines consistent with the goals of this subchapter:

A.    Identify and designate geographic areas in the municipality or multimunicipal region as growth areas and rural areas, as defined in this chapter.

1) Within growth areas, each municipality or multimunicipal region shall:

a) Establish development standards;
b) Establish timely permitting procedures;
c) Ensure that needed public services are available; and
d) Prevent inappropriate development in natural hazard areas, including flood plains and areas of high erosion.

2) Within rural areas, each municipality or multimunicipal region shall adopt land use policies and ordinances to discourage incompatible development. These policies and ordinances may include, without limitation, density limits, cluster or special zoning, acquisition of land or development rights, transfer of development rights pursuant to section 4328 and performance standards. The municipality or multimunicipal region should also identify which rural areas qualify as critical rural areas as defined in this chapter. Critical rural areas must receive priority consideration for proactive strategies designed to enhance rural industries, manage wildlife and fisheries habitat and preserve sensitive natural areas.

3) A municipality or multimunicipal region may also designate as a transitional area any portion of land area that does not meet the definition of either a growth area or a rural area. Such an area may be appropriate for medium-density development that does not require expansion of municipal facilities and does not include significant rural resources.

4) A municipality or multimunicipal region is not required to identify growth areas for residential, commercial or industrial

8

growth if it demonstrates that it is not possible to accommodate future residential, commercial or industrial growth in these areas because of severe physical limitations, including, without limitation, the lack of adequate water supply and sewage disposal services, very shallow soils or limitations imposed by protected natural resources.

5) A municipality or multimunicipal region is not required to identify growth areas for residential, commercial or industrial growth if it demonstrates that the municipality or multimunicipal region has experienced minimal or no residential, commercial or industrial development over the past decade and this condition is expected to continue over the 10-year planning period.

6) A municipality or multimunicipal region exercising the discretion afforded by subparagraph 4 or 5 shall review the basis for its demonstration during the periodic revisions undertaken pursuant to section 4347-A;

B. Develop a capital investment plan for financing the replacement and expansion of public facilities and services required to meet projected growth and development;

C. Protect, maintain and, when warranted, improve the water quality of each water body pursuant to Title 38, chapter 3, subchapter I, article 4-A and ensure that the water quality will be protected from long-term and cumulative increases in phosphorus from development in great pond watersheds;

D. Ensure that its land use policies and ordinances are consistent with applicable state law regarding critical natural resources. A municipality or multimunicipal region, if authorized to enact ordinances, may adopt ordinances more stringent than applicable state law;

E. Ensure the preservation of access to coastal waters necessary for commercial fishing, commercial mooring, docking and related parking facilities. Each coastal area may identify and designate one or more critical waterfront areas and implement policies to ensure protection of those areas or otherwise discourage new development that is incompatible with uses related to the marine resources industry;

F. Ensure the protection of agricultural and forest resources. Each municipality or multimunicipal region shall discourage new development that is incompatible with uses related to the agricultural and forest industries;

G. Ensure that the municipality's or multimunicipal region's land use policies and ordinances encourage the siting and construction of affordable housing within the community and comply with the requirements of section 4358 pertaining to individual mobile home and mobile home park siting and design requirements. The municipality or multimunicipal region shall seek to achieve a level of at least 10% of new residential development, based on a 5-year historical average of residential development in the municipality or multimunicipal region, that meets the definition of affordable housing. A municipality or multimunicipal region is encouraged to seek creative approaches to assist in the development of affordable housing, including, but not limited to, cluster housing, reduced minimum lot and frontage sizes, increased residential densities and use of municipally owned land;

H. Ensure that the value of historical and archeological resources is recognized and that protection is afforded to those resources that merit it;

I. Encourage the availability of and access to traditional outdoor

implemented its Growth Management Ordinance before the requisite studies and Comprehensive Plan were completed. Waterboro concedes the Ordinance was adopted July 24, 2002, effective July 1, 2002 while the Updated Comprehensive Plan was not adopted until April 25-26, 2003.

The Law Court has held that "a municipality that chooses to engage in a growth management program must adopt both a comprehensive plan and an implementation strategy" pursuant to 30-A M.R.S.A. § 4326. *Bragdon v. Town of Vassalboro*, 2001 ME 137, ¶ 7, 780 A.2d 299, 301. "A municipality that enacts a zoning ordinance is considered to be engaged in the implementation strategy phase of growth management program for which creation of a comprehensive plan is a *mandatory prerequisite*." *Id.* (emphasis added).

Waterboro points out that during the transition to a new comprehensive plan, however, "rate of growth" ordinances that are inconsistent with the new comprehensive plan may remain valid for many additional months. 30-A M.R.S.A. § 4314(3).

Here, it is difficult to see how Waterboro's Growth Management Ordinance escapes the requirements of 30-A M.R.S.A. § 4326 requiring the new comprehensive

---

recreation opportunities, including, without limitation, hunting, boating, fishing and hiking, and encourage the creation of greenbelts, public parks, trails and conservation easements. Each municipality or multimunicipal region shall identify and encourage the protection of undeveloped shoreland and other areas identified in the local planning process as meriting that protection; and

J. Develop management goals for great ponds pertaining to the type of shoreline character, intensity of surface water use, protection of resources of state significance and type of public access appropriate for the intensity of use of great ponds within the municipality's or multimunicipal region's jurisdiction.

4. REGIONAL COORDINATION PROGRAM. A regional coordination program must be developed with other municipalities or multimunicipal regions to manage shared resources and facilities, such as rivers, aquifers, transportation facilities and others. This program must provide for consistency with the comprehensive plans of other municipalities or multimunicipal regions for these resources and facilities.

plan as a "mandatory prerequisite" to implementation of zoning ordinances. *Bragdon v. Town of Vassalboro*, 2001 ME 137, ¶ 7, 780 A.2d 299, 301. Although individual provisions of the Growth Management Ordinance, including those governing Growth Permits, may fairly be categorized as "rate of growth ordinances" which would be valid for a time if incompatible with the Comprehensive Plan, the Growth Permit provisions are entirely compatible with the goals and objectives of Comprehensive Plan[3] and it is impossible to see how 30-A M.R.S.A. § 4314(3), can apply. Because implementation of the Growth Management Ordinance should not have preceded adoption of the Comprehensive Plan under the clear mandates of § 4326, Leighton may be entitled to some relief on this basis.

c. Constitutionality of the Growth Management Ordinance

Leighton argues that Waterboro's Growth Management Ordinance violates his right to equal protection under the Maine and United States Constitutions by allocating Growth Permits in an unfairly discriminatory manner.[4] The burden is upon Leighton, as the party attacking the constitutionality of the ordinance, to show by clear and irrefutable evidence that it infringes the paramount law. *Vella v. Town of Camden*, 677 A.2d 1051,1054 (Me. 1996). The burden is also on Leighton to establish the complete absence of any state of facts that would support the need for the ordinance. *Inhabitants of Town of Boothbay v. National Advertising Co.*, Me., 347 A.2d 419, 422 (1975) "The prohibition against denial of equal protection . . . is implicated only when action by the state results in treatment of that person different than that given similarly situated

---

[3] See, for example, "Goal 4 Design and implement policies that will limit impact of residential growth. . . . Considerations for controlled growth should include: growth ordinances." (Appnx. 29 at p. 13);

[4] Leighton has not briefed a takings claim in his original petition, and therefore waives it on appeal. *Biette v. Scott Dugas Trucking and Excavating, Inc.* 676 A.2d 490, 494 (Me. 1996); *State v. Babcock*, 361 A.2d 911, 913 n.1 (Me. 1976) (failure to brief issues listed on appeal constitutes waiver of those issues).

individuals." *Wellman v. Department of Human Services*, 574 A.2d 879, 883 (Me. 1990). Thus Leighton must demonstrate that, under the Growth Management Ordinance, he was treated differently from owners of similarly situated lots or projects. *Id.*

Here, the Growth Management Ordinance allows Waterboro to issue 70 Growth Permits per year. Subdivisions may not receive more than 50% of those permits. Any particular subdivision may not receive more than three growth permits in a given year, and no individual or entity within a subdivision may receive more than two. Housing for the elderly is excluded from these restrictions, and two permits are reserved for Habitat for Humanity or a similar non-profit organization.

Leighton seems to allege, as an owner of a subdivision with ten dwelling units, he has a lesser chance of getting growth permits for all his remaining unbuilt units than a subdivision owner with but three dwelling units left to build. True enough. However, while Leighton has no chance of obtaining growth permits for the ten remaining units in Victoria Park within one year, other subdivision owners also have no chance of obtaining growth permits for ten units in one year. The most permits any subdivision owner can obtain, regardless of the potential or approval of their site to accommodate new units, is three. It is impossible to see how Leighton is treated differently from other Waterboro subdivision owners in the number of permits available to him. Because Leighton does not meet his burden of establishing that he is treated differently from other similarly situated persons under the ordinance, his equal protection claim must fail. *Wellman v. Department of Human Services*, 574 A.2d 879, 883 (Me. 1990).

The entry will be as follows:

Petitioner Lesley Leighton's independent action seeking to invalidate the Growth Permit provisions of the Waterboro Growth Management Ordinance for violation of

equal protection provisions of the State and United States Constitution (Count II) fails and judgment on this claim is awarded to the Town.

Insofar as it rests on allegations of vested rights or illegality pursuant to its incompatibility with Waterboro's Comprehensive Plan, Petitioner Lesley Leighton's appeal seeking to overturn the decision of the Waterboro Zoning Board of Appeals (Count I), is DENIED.

However, by their own admission Waterboro appears to have *implemented* the Growth Management Ordinance in violation of express statutory provisions requiring adoption of the new Comprehensive Plan before implementing Growth Management Ordinances. 30-A M.R.S.A. § 4326. This error does not appear to be mitigated by the transitional and savings provisions of 30-A M.R.S.A. § 4314, which seems not to apply. Waterboro was in violation of 30-A M.R.S.A. § 4326 when it implemented the ordinances and denied Petitioner's growth permit, therefore Petitioner would appear to be entitled to some relief from that denial. Petitioner had approval for three additional building permits on July 23, 2002, which were never issued when the effective date of the ordinance requiring growth permits was set at July 1, 2002. The appropriate remedy is to remand with a mandate to issue those three building permits because, for reasons stated above, growth permits were not required.

The clerk may incorporate this order in the docket by reference.

Dated:     May ⅙, 2005

PLAINTIFF:
Alan Nelson Esq.
PRESCOTT LEMOINE JAMIESON & NELSON
PO BOX 1190
SACO ME  04072

Defendant
Natalie Burns, Esq.
JENSEN BAIRD GARDNER & HENRY
PO BOX 4510
PORTLAND ME 04112-4510

G. Arthur Brennan
Justice, Superior Court

13